May it please the Court, Counsel. My name is Linda Marshall. I represent the appellants in this case, and I would ask that the Court reserve three minutes for rebuttal. I would like to address first the first issue in the case, whether the trial court erred when it to you is non-actionable opinion. Counsel, I just have a procedural question. The dismissal was dismissal without prejudice, correct? It was. That is because the state statute, the state anti-slap statute, requires that it be dismissed without prejudice. And so the plaintiff could have then filed a new lawsuit alleging facts, hopefully that were sufficient to withstand a motion to strike. So do we actually have a final order? Well, this issue was brought up in the post-trial motions where we asked the Court to allow us to file an amended complaint, and she ultimately denied the motion to allow. Our argument was that under the statute, the judgment is always, on a motion, a slap, anti-slap motion, the judgment is always without prejudice. And so there was no way to get the legal issue, if you will, into a final status under that statute. But wasn't the problem there that there was no showing that the plaintiff could have alleged any facts that would have withstood another motion to strike? No. The motion there, we had ‑‑ I don't know that we could allege anything other or prove anything other than we alleged in the defamation case. So it would have been futile, then, to have allowed an amended complaint? No. The amended complaint was to allege an alternative theory under the intentional interference with contract. To drop the defamation claim, then? Pardon me? To drop the defamation claim, not allege a defamation cause of action? The proposed amended claim did not depend upon a finding of defamation. But the finding of defamation or not would not preclude the proposed amended claim. But weren't the basis for the other claims based on the same statement? No. The basis for the defamation claim was based on the first segment of the broadcast where Mr. Martino made the statement, they're just lying to you. The basis for the amended claim, intentional interference with contract, was on the alternative prong of that tort, that there was a wrongful motive. But it's the same statement. Pardon me? The same statement? No. And what was the statement? The proposed amended claim arose out of the third segment of the broadcast, which was some 45 minutes later. It does not depend upon the statement, they're not, they're just lying to you. It depends upon the, Mr. Martino's motive. Well, no, but the motive must be exhibited in some manner. What was, what was, what did Mr. Martino do that you contend was based on an improper motive? In the third segment of the broadcast, Mr. Martino gave out the telephone number and location of the, of the plaintiff and urged his listeners to call the plaintiff and tell them, you will never do business with them again knowing how they've treated this customer. And the implication, obviously, is that his listeners will never do business again with the plaintiff. We alleged that he did that with six improper motives, each of them improper, each of them in and of themselves, standing alone or in some combination, viable to, to support a claim for intentional interference with contract. The first four of those improper motives have never been disputed by the Appellees as being improper. They argue that the last two were proper, and those two were that Mr. Martino intended to harm Mount Hood Polaris for the entertainment of total strangers. The, the second of those two is that Mr. Martino intended to harm this business for his own profit. Now, the Appellees argue that those are proper motives. I think Was there a proposed amended complaint lodged with the Court at the time that the second motion to amend was filed? Yes, it was. And that proposed amended complaint alleges the acts that you've just described? Yes, Your Honor. And your position is that those allegations were not based on the statement, they're lying to you, but based on other conduct? They, those, those allegations were based on Mr. Martino's action of urging his listeners not to do business with my client. And that proposed amended complaint is a part of this record? Yes, it is. And what is that reference? ER111. Thank you. If I may, if I could just finish my explanation of why those two, why it makes a difference in what the Court should do. Because the Appellees do not contest the first four alternative motives as being improper, the last two are simply alternative motions, alternative motives. If the Court were to find, if the district court had found, and the district court did not reach this argument at all, but if the district court had found that those two motives were proper motives, the proper thing to do would not be to dismiss or say the whole claim was futile. The proper thing to do would be to strike those two allegations. Then the claim would go forward to the jury, and the question to the jury would be, what is the predominant motive? This is a typical mixed motive case. Again, the question of the procedural posture of the case, the trial judge had entered judgment without prejudice in favor of the defense prior to the plaintiff's motion to file an amended complaint. Correct? That's correct, Your Honor. That is correct. So procedurally, was that the correct motion to file? Well, the case had already been dismissed. The, the, here is, as a practical matter, what happened. The anti-slap motion was filed and argued and briefed, and we asked that if it were granted that we be allowed to amend. We asked that as a brief. You didn't make a motion to amend at that time. We did not. You just made that as a request in your opposition to the motion to strike. Exactly. Exactly. And that is candidly consistent with any number of cases that I have been a party to and have seen. But nonetheless, it is correct that the local rules require a motion to amend, and so we filed a, independent of the motion, we filed a motion under Rule 59, and then a motion under Rule 60, and in addition to that, filed a motion to amend, which the Court considered and denied. But let me, if I might just finish that, that one piece, that the proper thing to do, if those two allegations are not sufficient, would be to simply reject those two allegations, strike them or whatever, and allow the four allegations of improper motive to go to the jury, and this would just be an ordinary mixed motive case in which the jury would be asked what motive predominates. But these were claims that were not alleged in the original complaint. This is a, these are theories that were not alleged in the original complaint. The original complaint alleged that the interference was based on improper means of defamation. The amended complaint alleged that the interference was for improper purposes. Under Oregon, under Oregon law, there are two prongs to the tort of interference with contracts. I, there are alternative theories. They don't cancel one another out, don't depend upon one another. So basically, we alleged an alternative theory. Since the judgment had been entered without prejudice, the plaintiff could have actually filed a new lawsuit. That's correct. And that was not done. Is that because it may have been time-bored? No, that was not done because there was, because we believe that the original lawsuit was dismissed for an improper reason, and there is no way under the statute to get a final judgment in order to bring that issue to you folks as to whether the reason for the dismissal was proper if it is constantly dismissed without prejudice. It would just, and in fact, I believe Judge Brown made that comment, that this is just a very peculiar set of language in the statutes. But that is what the statute says. Have you abandoned the argument that the judge felt or a judge didn't understand that procedurally Rule 15 was available, that it was liberal as far as filing an amended pleading, and that she thought she was barred from considering Rule 15 because of the anti-SLAPP statute? No, I wouldn't have abandoned that argument, but I thought that the Court ought to have the full argument from a procedural standpoint. I believe the Court, I believe she went forward from that and recognized that that, that the state procedural statute could not restrict her discretion. Now, if there are no further questions on that, what I would like to do is to go back to the first issue because I want to spend a little bit of time on the Ninth Circuit case that was reported four months ago yesterday, and that is manufactured homes, communities, versus County of San Diego. And I do so, I called that, I called the, I wrote a letter to the Court to call your attention to that case a couple of weeks ago, but I'd like to spend some additional time on that case, focusing on that case because I submit that it is on all fours with the case in the present case. Procedurally, it's identical. It is, it started as a defamation and an intentional interference claim. The defendants filed a motion to dismiss under the California anti-SLAPP statute, which is similar to the Oregon anti-SLAPP statute. The defendants argued, as they did here, that the statement was merely opinion, and the trial court agreed with the defendants, as it did here, that the statement was merely opinion. The Ninth Circuit reversed, saying the issue is not whether the statement is an opinion, the issue is whether the statement is a provably false assertion of fact, or can be a false assertion of fact, which must be reserved for the jury. The statement and context in that case, I submit, is very close to the statement in this case. In that case, the statement at issue was they, the defendants, said that they, the defendants, lied to the county when they said that they had fixed the sewer situation. The court said that it is not unreasonable to imagine that a juror would conclude, or could conclude, that the speaker intended to say they lied when they said they fixed the sewage situation. Now, in this case, similar kind of a media situation, in response to information presented in a media situation, the caller, Melissa Faroglia, said they, referring to the appellants, they told me that they tried the watercraft, and it worked fine, and Mr. Martino said, they're just lying to you. Now, it seems to me that there is not much lie. Well, the difference in that case is that the speaker there was not expressing an opinion based on a set of facts that she outlined that were developed by someone else. This was just her statement, and the opinion says here, Jacob's statements were not true. And the fact is that she did not clearly attach to such an outline of fact, nor did she explicitly link her statements to an express factual basis. And neither did Mr. Martino. Well, he did on the basis of what the caller told him. The audience heard all the facts that he heard, and then he expressed his opinion. Yes. That's a little different. If I may, the test is whether he fully disclosed the basis for a statement. Okay? The first thing you have to do is to decide whether it's an opinion or not. Yes. The appellees have made no record at all that says it must be an opinion. But beyond that, the disclosure by Mr. Martino has to be a full disclosure, and he said nothing about what he was basing that opinion on. The appellees asked us to assume it. You would want him then to recapitulate what the caller stated? Well, let me postulate. Are these facts true? And do you think that a radio talk show host has to do outside research to check the validity of any opinion that's going to be expressed by him? But the listeners to that show know that he does. The listeners to that show know that those radio talk show hosts spew out a lot of misinformation. And they're just many times shooting their mouths off. They're just entertainment. It affects people. I think that's what happens. I mean, I don't listen to this. Well, with all due respect, that's not the way. I have some neighbors that do, and I worry about them. But anyway, she did outline all of her grievances. And then they turned around and they paid her. They gave her money back. But the record shows that the owner of this business had not only arranged for her to have her money back long before this broadcast and had urged the Polaris to do so, but he told her she was going to get her money back. And those are in the sworn affidavits. Did he really put pressure on the manufacturer to give her money back and get the check and give it to her? That is in his sworn testimony. It's going to come, you know, like you buy something in a store and you get a coupon and you get a dollar off and you send it in and maybe you get it and maybe you don't. No, in his sworn testimony, which we have to accept as fact, he said he not only urged Polaris to give her money back, but they told him they were going to pay her money back. It was a warranty claim. And he told her that they had said they were going to give her money back. And this was all before the broadcast. So it was just coincidental that she doesn't get the money back, though, until after the broadcast. Well, she got her money back the next day. It's a timing thing. It's a timing, yeah, well. And the listener... Oh, from the manufacturer. Is it true, based upon the record, that the listeners are hearing not only the statement made by Martino, they're just lying to you, but they also had the benefit of her statements to which Martino was responding? They do. And they also have the benefit of knowing that Mr. Martino has producers who do research to follow up on these statements made by listeners. And, in fact, he talks about that in the course of the broadcast. You know, I don't know that it affects the result, but if she got paid the next day, that must have meant they had the check. And if they had an opportunity to come on and say, we have the check, we're giving it to her tomorrow. Now, we're talking about two different companies. The warranty claim was owed by Polaris, the manufacturer. Yes. The company that Mr. Martino attacked was the retail seller. They didn't have a check, and they didn't owe her any money. But they did put pressure on Polaris to give her money back as a warranty claim, and Polaris did. It just didn't come until the next day. Well, when people buy something from a particular retailer, and it goes bad, they expect the retailer to give them their money back. I know you have warranties, but... And in the very first time... They're not looking at Polaris, they're looking at the retailer. Yeah. And in the very first time, this is also in the sworn testimony, which must be conclusively determined as fact, in the very first time that she asked for her money back, Mr. Gardner explained to her that it was a warranty claim, that it would be up to Polaris, the manufacturer, and that he would support her in her request for her money back, which he did. Polaris eventually told him that they would pay the money back, and he told her that she would get her money back. And then Polaris came through with the check. How much time elapsed? Approximately two months. That's a long time. I'm sure Mr. Gardner would say the same, but it's a warranty claim. It's a big company, Polaris, and it was their decision. Well, your warranties run out. I think you owe us 2 minutes, 33 seconds. Thank you. All right. May it please the Court. Counsel, my name is Charles Sinkel. I represent Tom Martino and Westwood One, which at the time distributed his program. First, with respect to Judge Marshall's comments or questions about the procedural posture, a final judgment of dismissal without prejudice is appealable under Oregon law, and it's appealable in the Ninth Circuit as well. It is true that a new complaint can be filed within a year after such a judgment, and the plaintiff did not do that. But I would ask, with respect to the merits of this question, whether or not the district judge acted properly in denying the post-judgment motion, I ask the Court to compare the allegations of the amended complaint, which is at ER 10, with the allegations of the proposed second amended complaint, which is at ER 111. The allegations of that second amended complaint are based on exactly the same facts. The original amended complaint alleged the full scope of the program. It alleged that third segment. It alleged that Tom Martino had mentioned the phone numbers over the air and had urged his callers to call Polaris. They alleged the same damages. They alleged the same interference with contract, not only existing contract, but a separate claim for interference with prospective economic advantage. Those are the identical claims that the plaintiffs repeated in the proposed second amended complaint. And so when the magistrator, it was Judge Brown, I guess, who looked at that, the second amended complaint, and said, well, you've just realleged the same set of facts that you did the first time. Let me ask you, what do you believe is procedurally properly before us? Which complaints, amended complaint, both? No, well, the amended complaint is on file, Your Honor. There's no question about that. No, no, I know that. And this appeal. Yes. What issues have properly been appealed? Well. Is there an appeal from a dismissal of the first complaint? Yes. All right. That's properly before us. Yes. And the appeal from the denial of the right to amend the complaint, the second amended complaint, or whatever it is. Yes. That's also properly before us. Yes, Your Honor. All right. Thank you. Yes. And on that procedural question of the second amended complaint, the plaintiff has appealed from two different orders. One was the order denying the prejudgment request, without a motion, request to file an amended complaint. And at that time, they did not tender an amended complaint. And it sounds from counsel's comments this morning that they agree that that claim is no longer valid. Post-judgment. So the only appeal properly before you, as I understand it now on the procedural question, is the post-judgment one. The post-judgment formal motion to file an amended complaint. That was properly denied on at least three grounds that are in the record. The first ground is that it is futile because it didn't cure the deficiency of the original complaint because the judge had already ruled that the original complaint that was filed right at the beginning of the case. Which was the subject of the motion to strike. Exactly, Your Honor. Yes. That that original complaint did not withstand constitutional challenge. That the statements made by Tom Martino, whether you consider them as the basis for the libel claim, the invasion of privacy claim, or the intentional interference with a contract claim, those statements were constitutionally protected. And so it is the same statements that plaintiffs are relying on in their second amended complaint. And the court has already ruled that those statements are constitutionally protected. The only change that was made. Is it your contention that they're constitutionally protected even if there was the improper motive of attempting to destroy the business of the plaintiff? Yes, Your Honor. Because you look again at these statements in context. Because in a sense, well this is in a sense like summary judgment. You have a record before you. This is not a Rule 21 motion or a Rule 16 motion to dismiss on the grounds of failure to state a claim. These anti-slap motions in Oregon, as in California, have taken on the aura of a summary judgment motion. Both sides file affidavits. There's a complete record before you. You have the complete transcript of the entire program. You have the CD of it. You have a recording of it. So you can listen to the colloquy. Unlike a 12B6 motion. Unlike a 12B6. I'm sorry. I couldn't think of the right one. I gave you the wrong number. So to summarize that aspect of it. The original claims for intentional interference were alleged fully, factually, in the amended complaint. The facts did not change. So you really both agree that there's only one legal issue. And that's basically whether the law protects these statements under the First Amendment. Yes. That's right. And with respect to the defamation claim, then, the question is whether or not, as plaintiff says, manufactured home is controlling or, as we say, underwager is controlling. You say what's controlling? Underwager. This Court's opinion in underwager against Channel 6. I thought Partington was pretty good for you. Partington is an excellent decision. I think you should follow it every jot and tittle. But underwager is of that same genre, of that same ilk. And the reason underwager is more precisely on the point factually is that underwager included a defamation claim based on this very same word, lying. And in a very similar context because it was a word that was uttered during the course of, in that case, a television interview on the Australian version of 60 Minutes, whereas here we have a radio interview going on. But the facts, there are more facts disclosed here than there were in underwager. I mean, as the Court has pointed out, you have Melissa Ferrolia coming on the air and saying that she'd had her jet ski in the shop repeated times, multiple overheating problems. The dealer had said, on the one hand, it was such a bad machine they were going to take it back. On the other hand, he said, it works great. They put a new engine in it. That didn't work. He writes a memo to Polaris saying there are still repeated overheating problems. And it is simply not true on this record that the manufacturer ever told her that she was going to get her money back. In fact, her affidavit says that two representatives of Polaris Industries, the manufacturer, told her that they never buy back product. And so, lo and behold, she goes on this consumer affairs show whose whole thing is they try to get both the consumer and the problem, the dealer, the seller, the manufacturer, or whatever it may be, they try to get them both on the air at the same time. And that CD illustrates it if you listen to the whole thing because there are other segments of the program that illustrate that. And they try to solve a problem. And, in fact, they did. Martino did solve this problem because it was the very next day that she got her check. The other case that's not particularly helpful to you is the Flowers versus Carville. Well, every case is fact-bound in a sense. You know, every case is rooted in the context and the both, as the court has said several times, both the general context and the specific context. There were some accusations. Many of the accusations in Flowers v. Carville were dismissed. There were some that the court said survived the opinion. But then they foundered on the actual malice. So the defendants won in Flowers v. Carville, just as they did in Unelco, even though they lost on the opinion. So they haven't, and I should say a word then about manufactured home. Well, before you leave Flowers v. Carville, to what extent do you think the plaintiff lost because it was a public figure? Well, there's no question that Flowers, that's why I said, yes, she won on actual malice. I mean, she lost on actual malice. The defendants ultimately won in Flowers because of a failure of actual malice. That's not an issue in this case because no one is contending here that these plaintiffs were public figures. But she had less protection. She had less protection. That's correct. And the opinion's a little unclear, at least to me, with statements like the speaker can't immunize a statement that implies false facts simply by an opinion based on those facts. And I think the court decisions are universal on that point, Your Honor. But consider again the question of what were the disclosed facts. The problem there that you just, in that sentence you just quoted, was that in the Carville case, the statement implied that there were undisclosed facts. Well, here, there had been a four- or five-minute colloquy in which Melissa Frollio, the consumer, had cited four or five or six specific instances of the runaround that she had been given. Well, it says a little more than that. It says, we have held that when a speaker outlines the factual basis for his conclusion, the statement is protected. That's from Partington. Then it says, this assumes, however, that the factual basis itself is true. Then the inference in that, in the next sentence, is that if the facts were not true, it doesn't protect the speaker. Your Honor, you have to look at Underwager then. Because the only thing that was stated there with respect to the lying accusation was the interviewer says to him, was Underwager, what about Underwager's claim that his credentials had never been challenged in court? And the response was, well, consider the Swann case, the Swann case in Washington in which his credentials had been challenged. And so the interviewer says, so he was perseverating. The interviewer says, well, if he's talking about the Swann ruling, you could say he was perseverating. Perseverating. Whatever that is. He had trouble with that. And it means lying, which is the reason for the next colloquy. Lying, the interviewer says. Yes, says Mr. Oates, who's the defendant in question at that point. I think it was Oates. There were multiple defendants there. So here, in contrast, we have many more facts that were disclosed. And none of the facts on which Ms. Marshall, counsel for the plaintiffs this morning, talks about other facts that are in dispute. But the facts that Melissa Feroglio told Tom Martino that morning are not in dispute. That the engine had overheated repeatedly. That the dealer had replaced it and said, oh, it works great. And then it continued to have overheating problems. The fact that out of the four months that she had owned it, it had operated for only 25 hours out of four months. The fact that it had been in the shop since September 8th, and now it's November 8th. The fact that there were Internet websites in which consumers complained about this very product and other dealers denied it. This was the back and forth that she was getting. And in response to that description of her problems from the consumer, the program, Martino's producer, tries to get Mt. Hood Polaris on the phone. Which is their modus operandi, their shtick in this program, as I said earlier. They get the consumer calls in and they try to get the other side on the phone to hear both sides of the story. You can, again, hear that because the tape has other segments of the show that morning that has Martino doing precisely that with respect to other consumer call-ins. So, Melissa gets on the phone, Martino's producer tries to call Polaris, the plaintiffs here, the dealer that is, and they refuse to come on the air. And Chris Kane then says on the air, well, they wouldn't talk to me. They said it's a manufacturer's problem. And so, Martino says, okay, call the manufacturer. They do that. Martino reports, truthfully, that the manufacturer told them that it's the dealer's problem. The consumer has to go to the dealer. And so, that's when Martino, in the third segment, makes his ping pong reference. She's getting bounced from the manufacturer to the dealer, to the manufacturer, to the dealer. She is getting the runaround. And I submit to you, Your Honor, that in context, when Tom Martino said in the first segment, oh, they're just lying to you, and he said it in that tone of voice, it wasn't an analytical, factual parsing of all the facts. It was a spontaneous response to the facts as they had been laid out by the consumer. And he makes that response just as though he'd said, they're giving you the runaround. Not so spontaneous when, at the beginning of segment three, he says, Polaris sucks. That's a very elegant way to put it. That's after, Your Honor, now they have made the phone calls to the dealer and to the manufacturer with the two responses that I just described. The dealer points to the manufacturer, and the manufacturer points to the dealer. And that's when he says, Polaris sucks. She can't get an answer out of either one of them. Not only have they told Melissa that, they have told us that now. They've told Martino that very morning. You know, they are reporting what happened as we speak, so to speak, that very morning when they tried to get both the dealer and the manufacturer to answer the phone, to come on the air and give their side of the story. They both refused, saying it's the other guy's problem. That's when he said, Polaris sucks, and he makes clicking noises. The statement, they're lying to you, makes reference to what? Well, according to the plaintiff, on page two of the gray brief, it is obvious that Martino's statement was in direct response to a specific statement. And yet she tries to tell you this morning that there are undisclosed facts that he was responding to. That isn't what she said in her brief. She says there, Martino's statement was in direct response to a specific statement, and the statement being, we took it out and tested it, and yes, it works great. Well, Melissa had heard that before. But had they previously indicated that they had not taken it out? No, no one ever made the contention that they had not taken it out, no. It was the works great part that he says, they're just lying to you. Because after all, she had taken it in by this time four times. This was the fourth time that she had taken her jet ski back to the dealer, and he had tried different things. One time he drilled the water intake valve, this is in the record, to try to make that bigger, thinking that if there was a greater flow of water through the thing, it wouldn't overheat. Then they tried replacing the engine altogether, and he sends a memo to the manufacturer then on September 9th, which is in the supplemental excerpt of record saying, oh, here it is. It's a supplemental excerpt of record at 21. We have put a new motor in it, and it is still overheating. This is John Gardner's own statement to the manufacturer on September 9th. He's not repeating what Melissa told him. He is making that statement to his manufacturer. We put a new motor in it, and it is still overheating. Two months later, now he says, oh, it works great. Melissa had some reason to doubt that. She had tried four times, taking it back in there, and it still didn't work. Tom Martino is basing his response on what she said, and he's trying to get the other side of the story. When the producer calls the other side, does the other side get advance notice that they're going to get a call from Martino? I don't know. There's nothing in the record that suggests that they did. No. They did get a call. They just call. They just call. You get on the line, you just call his company, and sometimes the big company, and then you try to get someone to talk to. I would think you'd get that kind of response. They don't want to come on the line, because no one who's responsible at that company really gets on the line, because they're not sure what you're doing. You get somebody on the phone, and maybe you've got to dial a number, and then you have to push this button, push that button, some other button, and you finally get a live voice after some time, and then that person who answers, they're flabbergasted. They don't know what to do with that call. Maybe they call the next person in line to them, and then you're going to get a common answer like that. So if you really wanted to get an honest answer,  that you're going to call, then they could get the person on the phone who would have the information. Well, Your Honor, the person they got on the phone was John Gardner, the owner of Mt. Hood Polaris, the dealer himself, who knew all about this, who had written the memo. Oh, no, I'm not talking about him. Oh, Polaris Industries. I'm talking about the company. Oh, Polaris Industries. Yeah, the manufacturer. Well, but whoever it was at the company said you have to talk to the dealer, which is consistent with what the company had told Melissa. Well, that's what they're going to say when you call them and they don't know in advance that Martino's going to call. Well, I don't think there's any issue. So we'd better come up with an answer. We'd better think about this. So you'll get someone who'll say, well, you'd better talk to the dealer. What else are they going to say? Well, in any event, I don't know that it matters whether these radio hosts are responsible people or not. No, no, I'm not saying that. Are you talking with Rush Limbaugh or Bill O'Reilly? Well, I don't know them. But I'm not disputing what you say. I just wonder about the fairness of calling people. Who said law is fair? Well, I just would urge you to listen to the rest of the team. That's what Earl Warren used to say. Yeah, he's long gone. What? Long gone. Yeah, well, it's resurrected. Listen to the rest of that tape because someone else calls in about a problem they had with Ken Lawn, something to do with their lawn treatment. And the consumer's on the line and Martino calls Ken Lawn and they get both sides of the story. And then the tape, unfortunately, ends. So we don't know how it turned out. But at least we know that the manufacturer was on the line or the company was on the line and the consumer was on the line. As I said earlier, that's his whole shtick. He tries to get both sides on the line and let's work this out. Yeah, well, it's a good shtick. The shtick is long enough. Thank you, Your Honor. I'd like to ask you one question. Would you want to come up to the... With your indulgence, I did give you some of mine. I know. But I want to ask you a question anyway. The question is, what facts in the... Ms. Martino's... Not Ms. Martino's. Melissa, whatever her name... What facts in her report to Martino do you allege are false? The... And that was exactly what I was going to address because Mr. Gardner, in his declaration, which is at ER 52, it's a seven-page declaration, he goes through and argues that her... The question was, which statements did she make, forget her name offhand, that you're saying were false. And she was talking to Martino. She made these statements. He identifies... Now, which of those statements do you contend is false? Okay. Mr. Gardner identifies a number of statements that Ms. Faraglia made that he says are false. Pick them off. Which are false? Let me tell you the most important. It's paragraph 20. He says, On or about October 22, 2004, I learned that Polaris had approved the buyback. This was two weeks before the broadcast. I learned that Polaris had approved the buyback and was going to refund Ms. Faraglia's money. It was unclear whether Polaris was going to send Ms. Faraglia a check directly or send it to me and have me pay Ms. Faraglia. I immediately passed this information on to Ms. Faraglia. So he is directly, and he does that in several other instances. But what statements did she make that are false? She made the statement that they promised to buy it back and now they're going back on that. Okay, what other statements did she make that were false? He, starting with, well, he describes the development of the problem with the watercraft and then he says on paragraph 9. Boy, what can you say? She said that it is false. I can't find the first one you're talking about. Where did she say something that was false? Can you tell us in her transcript where is there a false statement? I'm sorry, I'm a little bit hard of hearing and I can't hear you. In her transcript, can you point to a false statement? Don't explain to us why it's false. Just say which statement is false. Okay, let me put my hands on the transcript. It's ER, I think, 87. She said, well, I've owned it for four and a half months and it's only run 24 hours. Multiple overheating problems. I'm sorry, Your Honor, I just can't hear you. Multiple hearing problems. I mean, heating problems. Can you hear me now? Well, I'm looking for the transcript of what Ms. Veroglia said. I thought it was attached to the... ER 87. ER 87. ER 87 to ER 93. It's within that area. Okay. Starting on page, on ER 88, approximately the last third of the page, she says, the dealer told me he was taking it back, that it was too much trouble for him to work on, and in his opinion it was a bad machine. He wrote out an invoice saying that it was a bad buyback and now they are not honoring that. Mr. Gardner explained in detail in his declaration what he told her, that he told her that this was covered by a manufacturer's warranty, that he would support her if she wanted her money back, and in fact he did support her in getting her money back, and then she says, and now they're not honoring that. That is not true. Mr. Gardner's declaration that said that is not true has to be taken as established fact. He said that as soon as he learned that Polaris was going to pay it back. Did he say he wrote out an invoice saying it was a buyback? In his declaration he explained that that was not a promise to her. He wrote down her request, buyback. And now they are not honoring that. Right. And that is false. They is, who does they refer to? Well, the possibilities are Polaris Industries, the manufacturer, and Mount Hood Polaris, the dealer, and by the time she was saying this on the radio, Mr. Gardner had told her they were going to buy it back, were going to give her money back, and she said this anyway, and it's false. Well, she hadn't gotten her money yet, and two months had gone by. That's true, but on this record, Mr. Gardner's declaration must be accepted as the fact. What other false statements are there? Then on page, on ER 89, Mr. Martino, top of the page, Mr. Martino starts out, why don't they? Melissa says, it's not a new part, they just stuck a drill in it. And Mr. Martino says, which, again, Mr. Gardner's declaration explains is not true. It is not just a matter of sticking a drill in it. Where is that on 89? That's at the top of ER 89. Oh, I see. Melissa, it's not a new part, they just stuck a drill in it. Right. Not true. Then Mr. Martino goes on, why don't they? Why don't they go out and try it? Implying, of course, that they haven't, which is also false, because they had. Melissa says, well, on the 8th, when I called and asked why it hadn't been tried, they said, all of a sudden, they called me back two hours later and said, oh, we did try it, it works great. And Mr. Martino responds, yeah, they're just, yeah, they're just lying to you. Her implication was that they had not tested the watercraft or that it did not work fine. And the evidence in the record in four separate declarations that were accepted by the court, not objected to by the appellees, was that they had tried the watercraft four different times by three different people and it did work fine. So to the extent that the lying statement is based upon those facts, the facts or the implication of the facts is false. Well, she said it wasn't working, right? She said it was not working, they said it was. Well, so that's what he. We have to accept what they said. That's what he based his opinion on. Anything else? Well, I wanted to go back to Flowers v. Carville because I do believe Flowers v. Carville, in addition to the MHC case, are appropriately considered here. First of all, in the Flowers case, the court, as well as Partington and standing committee, the court goes to great efforts to determine whether it is possible for the statement to be interpreted as a factual statement. Because if the court can't, if even one reasonable juror can reach that conclusion based on the facts, then the decision is for the jury, not for the judge. An opinion is a broad, unfocused, and wholly subjective statement. Unless the court could say, based on this evidence, that this statement is pure opinion, you never get to any of these cases based on full disclosure. But if you do, then you ask whether there's full disclosure and whether the disclosed facts are accurate, and in this case, the record says that they are not accurate, and in addition to that, there is full disclosure by the speaker. Well, I think we've got this case well in hand, and we appreciate the argument on both sides, and it'll stand submitted. And now we come to State of Oregon v. Ebder. Thank you.
judges: Pregerson, Reinhardt, Marshall